UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

JANET WHITE

                Plaintiff,

       -against-                                  **COMPLAINT**

BEST CHEESE CORPORATION, COACH
FARM ENTERPRISES, INC., BEST CHEESE         **PLAINTIFF DEMANDS**
TRADING CORP., UNIEKAAS U.S.A., INC.,         **TRIAL BY JURY**
UNIEKAAS INTERNATIONAL BV,
WILLEM JAN ROTE, individually and
STEVEN MILLARD, individually,

                Defendants.
-------------------------------------------------------------------X

      Plaintiff Janet White, through her undersigned attorneys, as and for her complaint in this action, avers, upon knowledge as to her own acts and status and upon information and belief as to the acts and status of others, as follows:

      1.     This action seeks redress for employment discrimination against plaintiff Janet White on the basis of her sex and her age, in violation of federal and New York State law, for defamation and for intentional and negligent infliction of emotional distress.

The Parties

      2.     Plaintiff Janet White is a 66 year-old female, a citizen of the United States and a resident of Patterson, New York.

      3.     Defendant Best Cheese Corporation ("Best Cheese") is a corporation organized under the laws of the State of New York and having its principal place of business in Purchase, New York.  It is engaged in the business of importing Dutch cheeses and distributing Dutch and domestically-produced cheeses in interstate commerce.  It is a wholly-owned

1

subsidiary of defendant Uniekaas International BV.  At all times since at least 2012, Best Cheese

has had more than 15 employees and meets the definition of an "employer" under applicable

federal and state statutes.

4.      Defendant Coach Farm Enterprises, Inc. ("Coach Farm") is corporation

organized under the laws of New York with its place of business in Pine Plains, New York.  It is

a wholly-owned subsidiary of Best Cheese.  At all times since at least 2012, Coach Farm has had

more than 20 employees and meets the definition of an "employer" under applicable federal and

state statutes.

5.      Defendant Best Cheese Trading Corp. ("Best Cheese Trading") is a

corporation organized under the laws of New York with its place of business in Purchase, New

York.  It is a wholly-owned subsidiary of Best Cheese.

6.      Defendant Uniekaas U.S.A., Inc. ("Uniekaas U.S.A.") is a corporation

organized under the laws of Delaware with its place of business in Purchase, New York.  It is

owned 51% by Uniekaas International BV and 49% by Best Cheese.

7.      Defendant Uniekaas International BV ("Uniekaas") is a company

organized under the laws of the Netherlands with its principal place of business in Kaatsheuvel,

Netherlands.

8.      Defendant Steven Millard ("Millard") is a resident of New York State and,

since August 2015, has been the Chief Executive Officer of Best Cheese.  He is approximately

52 years old.

9.      Defendant Willem Jan Rote ("Rote") is citizen and resident of the

Netherlands and, since approximately 2012, has been a principal owner and officer of Uniekaas.

He is approximately 54 years old.

2

Jurisdiction, Venue and Satisfaction of Administrative Prerequisites to Suit

10.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1343, 1367 and 2201 and the principals of supplemental jurisdiction.

11.     This Court has jurisdiction over the persons of Defendants, pursuant to New York Civil Practice Law and Rules §§ 301 and 302 and federal law, in that Defendants reside in, or are present and do continuous and systematic business in, New York State; and/or because Plaintiff's claims against them in this action arise from their transaction of business within New York State, and/or from their commission of tortious acts within New York State and/or from their commission of tortious acts without the State that have injured Plaintiff within the State, and they regularly do or solicit business, or engage in other persistent courses of conduct, or derive substantial revenue from goods used or consumed or services rendered in New York State, and/or expect or reasonably should expect their acts to have consequences in the State and derive substantial revenue from interstate or international commerce; and have such other minimum contacts with and connections to New York State such that the exercise by this Court of jurisdiction over their persons will not offend traditional notions of fair play and substantial justice.

12.     Venue is properly laid in this Court pursuant to 28 U.S.C. § 1391(b) in that a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Southern District of New York.

13.     On or about January 10, 2017, Plaintiff filed a charge with the United States Equal Employment Opportunity Commission (the "EEOC") complaining of the same discriminatory conduct that gives rise to her claims in this action.  The EEOC assigned Charge

number 520-2017-01642 to Plaintiff's filing and, on June 13, 2017, issued to her a Notice of Right to Sue (a copy of which is annexed hereto as Exhibit 1).

<u>Facts</u>

14.     From 2001 until December 9, 2016, Plaintiff was employed by Best Cheese. From about 2008 on, Plaintiff was the company's Chief Financial Officer. At all times between at least 2012 and December 9, 2016, Plaintiff was both the oldest employee of the company and its highest ranking female employee.

15.     Although Plaintiff was, officially, employed by Best Cheese, she also regularly performed services for Coach Farm and Best Cheese Trading, including the preparation of monthly financial statements. Plaintiff also prepared the annual financial statements for Uniekaas U.S.A. Best Cheese and Coach Farm have approximately 50 employees altogether.

16.     Best Cheese, Coach Farm, Best Cheese Trading, Uniekaas U.S.A. and Uniekaas (collectively, the "Employer Defendants") had sufficient interrelation of operations, centralized control of labor relations, common management and common ownership and financial control that they should be deemed a single, integrated enterprise that was Plaintiff's employer.

17.     Additionally or alternatively, the Employer Defendants handled aspects of their employer-employee relationships jointly such that they should be deemed joint employers of Plaintiff.

18.     At the time Plaintiff first came to work for Best Cheese, its President was Hendrik Engelkes ("Engelkes"), a Dutch citizen and a shareholder of Uniekaas. Plaintiff's job duties and compensation (including certain "mileage" allowances and insurance benefits) were

based on agreements reached between Engelkes and Plaintiff in the early years of Plaintiff's employment.

19.     Around 2005, Engelkes acquired a two-thirds interest in Best Cheese. Uniekaas continued to own one-third.  Engelkes continued to run Best Cheese, and Plaintiff continued to report to him.

20.     Around 2007, both Uniekaas and Best Cheese were acquired by a group of investors that included Rote and another individual, Paul Wilde ("Wilde").

21.     Around early 2008, Steve Margarites ("Margarites") succeeded Engelkes as President of Best Cheese and Plaintiff was given the title of Chief Financial Officer.

22.     The arrangements concerning Plaintiff's job responsibilities and compensation (including "mileage" allowances and insurance benefits) that she had worked out with Engelkes were continued under Margarites, with his knowledge and approval.

23.     In about 2012, Rote and Wilde bought out another shareholder in Uniekaas and thereby acquired, between the two of them, a majority interest in Uniekaas and, therefore, control of Best Cheese.

24.     Immediately after that -- although Plaintiff did not know it at the time -- Rote began consistently and explicitly telling Margarites that he and other owners of Uniekaas wanted Plaintiff to be fired and replaced with a younger man.  Rote made these statements repeatedly, in face-to-face meetings in the Netherlands and in New York, as well as in telephone conversations.

25.     Margarites, whose employment contract provided that no employee could be terminated without his approval, consistently refused to fire Plaintiff, and explained to Rote that Plaintiff was "fantastic" at her job.

26.     Rote also routinely mocked Plaintiff's physical appearance.  When
Margarites asked Rote why Rote wanted Plaintiff fired, Rote replied "look at her!" and spread
his arms wide in a gesture to indicate that Plaintiff was an unattractively heavyset woman.

27.     Rote also routinely told Margarites that Plaintiff did "not look like a
CFO".  When Margarites asked Rote what he thought a CFO "looked like", Rote referred to the
former CFO of Uniekaas, Willem Van Meeuwen, and said "*this* is what a CFO looks like".  A
copy of Willem Van Meeuwen's LinkedIn profile is attached as Exhibit 2 to this Complaint and
incorporated by reference herein.  It shows that he appears to be a handsome, slender man in his
forties.

28.     Beginning in 2012 and continuing until 2015, Rote -- unable, over
Margarites's objections, to get Plaintiff fired outright and replaced with a younger man --
repeatedly urged Margarites to demote Plaintiff, on the pretext that she was "unqualified" for her
job.  In fact, Plaintiff was fully qualified for her job and had been doing it superbly for years.

29.     Rote also repeatedly urged Margarites to "break her", by which Rote
meant, and Margarites clearly understood him to mean, to make Plaintiff's working environment
so miserable that she would be driven to quit.  Margarites consistently refused to do this, and
assured Rote that Plaintiff was excellent at her job.

30.     From the time she first came to work at Best Cheese in 2001, and
continuously until about March 2016, Plaintiff received nothing but positive feedback on her job
performance.  She routinely worked longer hours than any other employee of Best Cheese,
frequently staying late into the evening and coming into the office on weekends.  Her working
and personal relationships with Engelkes and Margarites were always excellent and she received

regular annual raises in salary and substantial bonuses for each year of her employment though 2015.

31.     In December 2014, Plaintiff's salary for 2015 was raised to $175,000, and she received a year-end bonus of $27,000.

32.     Plaintiff planned to work through the end of 2020, the year in which she would turn 70, and discussed this plan with Wilde in July 2015. Wilde assured her that her future employment for that period of time was secure.

33.     Margarites left Best Cheese around June 2015 and, in August 2015, Uniekaas and Rote arranged for Millard to succeed him. Millard, acting at the direction and with the approval of Rote and Uniekaas, promptly began a persistent course of discriminatory and unlawful conduct against Plaintiff.

34.     Shortly after his arrival, Millard informed Plaintiff that, effective October 1, 2015, her compensation would be increased to include a salary of $195,000 and an annual target bonus of 20%. Millard also agreed to include, as a new component of Plaintiff's compensation, a $300 per month "car allowance". This "car allowance" was to be in addition to the "mileage" allowances and other benefits Plaintiff had theretofore been receiving pursuant to arrangements worked out with Engelkes and continued under Margarites. With the increase in compensation, however, Millard told Plaintiff that her job duties as Chief Financial Officer would significantly increase and would include many time-consuming tasks that had never been part of the job before.

35.     Some of these new duties Defendants imposed on Plaintiff would achieve nothing useful to the company and would merely waste time, as Plaintiff attempted politely to explain to Millard. Plaintiff believed, at the time, that Millard's insistence that she take on these

7

pointless new responsibilities simply reflected Millard's lack of familiarity with the relatively

informal corporate culture of Best Cheese and Coach Farm, and the way they had been run,

smoothly and profitably, for years.

36.    Other new duties Millard imposed on Plaintiff were not, in and of

themselves, bad ideas, but, as Plaintiff told Millard, she was already working seven days a week

and simply did not have the time to take on more herself.

37.    Plaintiff raised with Millard the possibility of hiring additional staff to

assist her with the increased duties that she was being directed to perform.  Millard pretended to

be receptive to that idea, but no staff was ever added.  Instead, Millard sabotaged Plaintiff's

efforts to recruit additional staff.  Millard rejected one particularly promising candidate Plaintiff

had recruited to work as Controller because, Millard said, that recruit had never personally fired

anyone. This objection was pretextual and made no sense because the position of Controller

would have involved no hiring or firing authority.

38.    Despite Plaintiff's stated reservations, the additional duties were imposed

on her starting on or around October 1, 2015.  Plaintiff continued to do her job and, for the rest

of 2015 and into 2016, neither Millard nor anyone else expressed dissatisfaction with Plaintiff's

job performance.

39.    To the contrary, for 2015 Plaintiff received a year-end bonus of $48,750

(or 25% of $195,000, even though Plaintiff's salary had not been raised to that level until

October 1, 2015).

40.    Furthermore, Millard was especially happy to let Plaintiff direct the very

large amount of work required in January and February 2016 to generate the companies' 2015

financial statements and prepare for the year-end audit.

41.     Once the year-end audit was properly completed in March, however, things suddenly changed. Millard started complaining constantly that Plaintiff was not, in his view, adequately performing the additional job functions Defendants had imposed on her the previous October. Plaintiff protested that Millard's criticisms were unfair and that these heightened demands Defendants were foisting on her were largely pointless and unrealistic, and repeated that she needed additional staff to assist her with them.

42.     In fact, by imposing these additional duties on Plaintiff without providing her with the additional staff needed to perform them, Defendants were merely creating a hostile work environment for Plaintiff and setting her up to fail -- in other words, attempting to "break her" just as Rote had been urging Margarites to do since 2012.

43.     The abusive and unfair treatment to which Millard subjected Plaintiff was totally unlike any treatment she had ever received from Engelkes or Margarites or, for that matter, from any supervisor to whom she had ever reported at any time in her 38-year business career.

44.     Millard also went out of his way to humiliate Plaintiff in other ways. In the summer of 2016, for example, during a mandatory strategic management conference at the Doral Arrowwood in Rye Brook, New York, Plaintiff was badgered into participating in a golf outing, although Millard knew that she did not play golf and was not physically up to it. At one point on the golf course, at a considerable distance from the clubhouse, Plaintiff found herself in need of a ladies' restroom. Millard and a group of other male employees, laughing at her distress, told Plaintiff and another female employee to "go [i.e., relieve themselves] in the woods" as the men in the group had been doing. Without any other choice, Plaintiff was forced

to do just that. She suffered a fall when attempting to find her way through the woods back to the golf course.

        45.     On August 15, 2016, Millard presented Plaintiff with a letter announcing the company intended to demote her from Chief Financial Officer to Controller and to cut her base salary from $195,000 to $140,000, with a year-end target bonus of 20%. Millard stated that this change would go into effect on September 1.

        46.     Millard also informed Plaintiff that the company had already hired a new Chief Financial Officer to replace her.

        47.     Millard told Plaintiff the announcement of this change "should come from you" -- meaning he expected Plaintiff to announce her own demotion and replacement to the Best Cheese/Coach Farm staff, as if it had been her idea.

        48.     It was also arranged for Plaintiff to have lunch, on August 17, 2016, with the incoming Chief Financial Officer, who turned out to be Jan Poulson ("Poulson"), a male who appears to be in his early thirties.

        49.     During that lunch, Poulson mentioned that he had been told that Plaintiff had "decided to retire". That she had "decided to retire" came as news to Plaintiff.

        50.     At that point, plaintiff hired a lawyer, Louis A. Craco, Jr. ("Craco") of Allegaert Berger & Vogel LLP, to represent her. On August 30, 2016, Craco wrote to Millard at Best Cheese and to Rote at Uniekaas, complaining of the discriminatory treatment and harassment to which they had subjected Plaintiff and rejecting the proposed demotion and the pay cut. Craco's letter also warned that Plaintiff was prepared to commence litigation if a more satisfactory resolution could not be arrived at promptly. Craco also cautioned Rote and Millard

"pending resolution of this matter, not to terminate Ms. White's employment, reduce her compensation, disparage or harass her, or take any other action to her detriment".

51.     That same day, shortly after receiving Craco's letter, Millard called Plaintiff into his office and scolded her for getting a lawyer involved.

52.     The next evening, August 31, 2016, after all other employees had left, Millard came into Plaintiff's office and handed her a memo that stated she was being placed on "Paid Administrative Leave" which supposedly meant that she was "still on the payroll and actively employed by Best Cheese" but that she was "not to report for work or perform any duties unless and until you are notified by the Company to do so."

53.     Millard then hurriedly ordered Plaintiff out of Best Cheese's offices and hovered nearby until she left.  Plaintiff was not even given the opportunity to clear out her personal items.

54.     Plaintiff was also immediately locked out of her work computer, which made it impossible for her to access the company's Employee Manual to determine whether the company actually had any policies governing "Paid Administrative Leave" and, if so, whether they were being followed.

55.     On September 15, 2016, Craco wrote to counsel for Best Cheese and Uniekaas, denouncing Plaintiff's being placed on "Administrative Leave" as retaliation in violation of applicable civil rights laws, and advising that his firm was preparing to file charges with the EEOC.

56.     Plaintiff remained on "Administrative Leave" from September 1 through December 9, 2016, receiving a salary but being forbidden to come to the office, do any work or access the company's files.

57.     In or around September 2016, in response to a request from one of Best Cheese's lawyers, Craco communicated a specific settlement offer from Plaintiff.  Best Cheese never responded to that offer.

58.     On December 6, 2016, Plaintiff received a letter, bearing the letterhead of both Uniekaas and Best Cheese, which stated "[t]his letter is being sent to notify you that your employment with the Best Cheese Corporation is terminated effective 12/9/16.  Due to significant misfeasance all employment activities, salary and benefits cease that day."  The letter was not signed by any individual and did not identify its author, but it closed with "Regards, The Best Cheese Company and Uniekaas Nederland B.V."  It did not specify what "significant misfeasance" it was referring to.

59.     No representative of any Defendant had ever before suggested to Plaintiff that she had committed any kind of "misfeasance" or improper conduct in the course of her employment.

60.      On or about December 12, 2016, Plaintiff submitted an application for unemployment insurance benefits to the New York State Department of Labor ("DOL").

61.     On or about December 16, 2016, Defendants launched a defamatory smear campaign against Plaintiff, consisting of repeated false statements to various persons that Plaintiff had stolen funds from Best Cheese and had been terminated for that reason. Defendants' motives for disseminating these false statements were (i) to menace her with the prospect of criminal charges, inability to collect unemployment insurance payments and reputational ruin, in order to deter her from going forward with the EEOC charges and civil suit they knew she was preparing to file; (ii) to concoct a non-discriminatory explanation for Plaintiff's termination with which to defend themselves in EEOC or court proceedings if

Plaintiff could not be deterred from commencing them; and (iii) to further retaliate against her for protesting their attempt to demote her and to cut her pay and her placement on "Administrative Leave" and for her determination to assert her legal rights before the EEOC and in court.

62.     At some time on or before December 21, 2016, Millard filed a criminal complaint against Plaintiff with the Harrison, New York Police Department, which contained false statements that Plaintiff had "embezzled funds" from Best Cheese and had been fired for doing so.  Furthermore, during a conversation with Detective Kevin Wong of the Harrison Police Department and Kuuku Minnah-Donkoh, a lawyer for Best Cheese, Millard stated that Plaintiff was entitled only to her $300 per month car allowance but that she had nonetheless claimed and received additional "mileage" reimbursements to which she was not entitled.  Millard's statement to that effect was false when he made it, and he knew or was reckless not to know that it was false, in that the agreed-upon $300 car allowance was in addition to, rather than a replacement for, the "mileage" allowances and other benefits Plaintiff had previously claimed and received pursuant to her earlier understandings with Engelkes, Margarites and Best Cheese, and all reimbursements for "mileage" she had claimed were in compliance with those understandings.  Millard's false accusations against Plaintiff resulted in the initiation of a criminal investigation of Plaintiff.

63.     Best Cheese also made numerous similar false statements to the representatives of Paychex, the payroll service used by Best Cheese, with the intent that Paychex should repeat those false statements to DOL and thus undermine Plaintiff's application for unemployment benefits.  The substance of false statements Best Cheese and its representative(s)

13

made to Paychex, and which Paychex repeated to DOL at various times in December 2016 and

January 2017, included the following:

       (a)   Plaintiff "was misappropriating funds and the employer believes it has been

going on for years";

       (b)   Plaintiff "was overstating money to be reimbursed for her for expenses";

       (c)   Plaintiff "was discharged for misfeasance, misappropriating funds and the

employer believes it had been going on for years";

       (d)   Plaintiff's actions "affected the business by creating a financial loss";

       (e)   Plaintiff "violated numerous financial policies";

       (f)    Plaintiff disregarded an expectation "not to misappropriate funds";

       (g)   Plaintiff would have known that Plaintiff's "misappropriating funds was both

illegal and unethical and goes against the Companies' code of conduct";

       (h)   Plaintiff's discharge was a "Misconduct Discharge".

       64.     As a direct result of the foregoing false statements to DOL, on or about

January 10, 2017, DOL notified Plaintiff that it had made the following Determination: "You

were discharged for misconduct in connection with your employment with [Best Cheese Corp.].

Because of this determination, you will not be able to use your wages from this employer before

12/10/2016 to collect unemployment insurance benefits in the future."

       65.     DOL gave the following reason for its Determination: "You were

discharged on 12/9/16 because you misappropriated funds by overstating money to be

reimbursed for your expenses.  You knew or should have known that your actions would

jeopardize your job."

66.     On or about January 18, 2017, Plaintiff wrote to DOL, categorically denying the foregoing accusations by Best Cheese, advising DOL that her termination was the culmination of a three-year long course of discrimination by her employer based on her age and gender, and explaining that the false accusations by Best Cheese were an "effort to concoct some defense to the EEOC charges they knew I was preparing to file and to the employment discrimination lawsuit they correctly fear is coming".

67.     As a result of this correspondence, on or about February 7, 2017, DOL notified Best Cheese that it was reversing its earlier Determination and allowing Plaintiff's claims for unemployment benefits.  On or about February 10, 2017, Plaintiff finally received her first unemployment check from DOL, which was retroactive to the week ended December 23, 2016.

68.     Defendants nonetheless continued their campaign of harassment and retaliation by objecting to DOL's determination that Plaintiff was entitled to unemployment benefits.  On March 20, 2017, Plaintiff received by mail from DOL's Unemployment Insurance Appeal Board a notice that a hearing had been scheduled for March 28 before an Administrative Law Judge.  According to that notice, the issues to be determined at the hearing included "loss of employment through misconduct".

69.     On March 21, 2017, Craco wrote to the Administrative Law Judge assigned to the hearing to ask that the hearing be rescheduled in order to enable Plaintiff to call Margarites as a witness.  Plaintiff intended to call Margarites at the hearing because he would testify that all the expense reimbursements Plaintiff had claimed, and that Best Cheese later characterized as "embezzlement" and "misappropriation" had, in fact, been agreed to by Best Cheese, had been paid to Plaintiff routinely for many years and were entirely proper.

70.     Best Cheese withdrew its appeal the following day.  The March 28 hearing was cancelled.

71.     Nonetheless, as a consequence of Defendants' determination to retaliate against her and harass her by making false accusations about her to DOL, Plaintiff continued thereafter to receive correspondence from the DOL.  Specifically, by letter to Plaintiff dated April 13, 2017, DOL requested that Plaintiff provide "additional information" regarding accusations of Best Cheese that her "separation from employment was a result of a charge, arrest and/or violation of the law" and that she was "discharged due to theft".

72.     Defendants' conduct has caused and will continue to cause Plaintiff intense emotional distress.

73.     It has also caused, and threatens to continue to cause, Plaintiff significant financial harm, including but not limited to the loss the year-end bonus she should have received for 2016 and the value of the salary, bonuses, insurance and other benefits that she would have earned between December 9, 2016 and at least December 31, 2020.

### AS AND FOR A FIRST CAUSE OF ACTION
#### (Against the Employer Defendants, for Sex Discrimination in Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII"))

74.     Plaintiff repeats and realleges the foregoing paragraphs 1 through 73 as if fully set forth herein.

75.     Plaintiff was at all relevant times an "employee" covered by 42 U.S.C. § 2000e *et seq*.

76.     The Employer Defendants were, at all relevant times, Plaintiff's "employer" within the meaning of 42 U.S.C. § 2000e *et seq*.

77.     By the conduct alleged above, the Employer Defendants, by and through their officers, agents and employees, have discriminated against Plaintiff with respect to the compensation, terms, conditions and privileges of her employment in substantial part because of her sex.

78.     Such discrimination has included Rote repeatedly urging Margarites to fire Plaintiff and replace her with a younger man; Rote's urging Margarites to fire Plaintiff because he and others at Uniekaas regarded her as an unattractive and heavyset woman; Rote's urging Margarites to "break her", i.e., to create a hostile work environment that would drive Plaintiff to quit; the pretextual assertions that she was unqualified for her job when she had, in fact, proven herself for years to be highly qualified for it; the creation of a hostile work environment through, among other things, the assignment to Plaintiff, effective October 1, 2015, of largely pointless and wasteful additional job responsibilities without providing her with additional staff and other resources necessary to perform them; Millard's unfair and pretextual criticisms of Plaintiff for her supposed failure adequately to perform those additional job responsibilities; the unfair, unprofessional and abusive treatment and humiliation to which Plaintiff was subjected by Millard and others, including but not limited to that alleged in the foregoing paragraphs 44 through 49; the attempt, in August 2016, to demote Plaintiff to Controller and to reduce her compensation; Plaintiff's replacement as Chief Financial Officer by a man approximately half her age; Millard's scolding Plaintiff for obtaining counsel to represent her in connection with the foregoing discriminatory conduct; placing her on "Administrative Leave", banishing her from her workplace and cutting off her access to her work computer and important files stored on it; terminating her employment; and making false, defamatory and pretextual statements about Plaintiff's conduct and the reasons for her termination to various persons.

79.     By virtue of the foregoing conduct, Plaintiff has suffered, and will continue to suffer, substantial economic losses, embarrassment, emotional distress, and other injury.

AS AND FOR A SECOND CAUSE OF ACTION
(Against All Defendants, for Sex Discrimination in Violation of the New York State Human Rights Law, New York Executive Law § 290 *et seq*. ("NYSHRL"))

80.     Plaintiff repeats and realleges the foregoing paragraphs 1 through 79 as if fully set forth herein.

81.     The Employer Defendants were, at all relevant times, Plaintiff's "employer" within the meaning of New York Executive Law § 292(5).

82.     By the conduct alleged above, including but not limited to that conduct summarized in the foregoing paragraph 78, Defendants, by and through their officers, agents and employees, have engaged in unlawful discriminatory practices against Plaintiff with respect to the compensation, terms, conditions and privileges of her employment because of her sex, in violation of New York Executive Law § 296(1).

83.     Defendants, including Millard and Rote, have also aided, abetted, incited, compelled and coerced the aforementioned unlawful discriminatory practices, in violation of New York Executive Law § 296(6).

84.     By virtue of the foregoing conduct, Plaintiff has suffered, and will continue to suffer, substantial economic losses, embarrassment, emotional distress, and other injury.

<u>AS AND FOR A THIRD CAUSE OF ACTION</u>
<u>(Against the Employer Defendants, for Age Discrimination in Violation of the Age</u>
<u>Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* ("ADEA"))</u>

85.     Plaintiff repeats and realleges the foregoing paragraphs 1 through 84 as if fully set forth herein.

86.     At all relevant times, Plaintiff was an "employee" within the meaning of 29 U.S.C. § 621 *et. seq.*

87.     At all relevant times, the Employer Defendants were Plaintiff's "employer" within the meaning of 29 U.S.C. § 630(b).

88.     By the conduct alleged above, including but not limited to that conduct summarized in the foregoing paragraph 78, the Employer Defendants, by and through their officers, agents and employees, have discriminated against Plaintiff with respect to the compensation, terms, conditions and privileges of her employment in substantial part because of her age.

89.     By virtue of the foregoing conduct, Plaintiff has suffered, and will continue to suffer, substantial economic losses, embarrassment, emotional distress, and other injury.

<u>AS AND FOR A FOURTH CAUSE OF ACTION</u>
<u>(Against All Defendants, for Age Discrimination in Violation of the NYSHRL)</u>

90.     Plaintiff repeats and realleges the foregoing paragraphs 1 through 89 as if fully set forth herein.

91.     By the conduct alleged above, including but not limited to that conduct summarized in the foregoing paragraph 78, Defendants, by and through their officers, agents and employees, have engaged in unlawful discriminatory practices against Plaintiff with respect to

the compensation, terms, conditions and privileges of her employment because of her age, in

violation of New York Executive Law § 296(1).

92.     Defendants, including Millard and Rote, have also aided, abetted, incited,

compelled and coerced the aforementioned unlawful discriminatory practices, in violation of

New York Executive Law § 296(6).

93.     By virtue of the foregoing conduct, Plaintiff has suffered, and will

continue to suffer, substantial economic losses, embarrassment, emotional distress, and other

injury.

AS AND FOR A FIFTH CAUSE OF ACTION
(Against the Employer Defendants, for Retaliation in Violation of Title VII and the ADEA)

94.     Plaintiff repeats and realleges the foregoing paragraphs 1 through 93 as if

fully set forth herein.

95.     Plaintiff engaged in certain activities protected by Title VII and the

ADEA, including but not limited to objecting to the assignment to Plaintiff, effective October 1,

2015, of largely pointless and wasteful additional job responsibilities without providing her with

additional staff and other resources necessary to perform them; protesting Millard's unfair and

pretextual criticisms of Plaintiff for her supposed failure adequately to perform those additional

job responsibilities; engaging counsel to represent her and assert and protect her rights in

connection with the discriminatory treatment to which she had been and continues to be

subjected by Defendants; having her counsel write letters to Millard, Rote and Defendants'

lawyers to complain about Defendants' discriminatory treatment of Plaintiff and to demand that

it stop; indicating an intention to file charges of discrimination with the EEOC, and doing so;

indicating an intention to commence litigation to redress Defendants' discriminatory treatment of

her; applying for unemployment insurance benefits; and communicating with DOL to dispute Defendants' false statements that she had been terminated for any kind of misconduct.

96.     The Employer Defendants were aware that Plaintiff had engaged in the foregoing protected activity.

97.     Because of her protected activities, the Employer Defendants took adverse employment action against Plaintiff, including, but not limited to, scolding her for engaging counsel to represent her; placing her on "Administrative Leave", banishing her from her workplace and cutting off her computer access to files she needed, including company manuals about employment policies; terminating her employment; falsely asserting to various persons that Plaintiff's employment had been terminated because of misconduct; making false statements to the Harrison, New York Police Department, thereby inducing it to open a criminal investigation of Plaintiff; and making false statements to Paychex and DOL to undermine Plaintiff's application for unemployment benefits.

98.     By virtue of the foregoing conduct, Plaintiff has suffered, and will continue to suffer, substantial economic losses, embarrassment, emotional distress, and other injury.

AS AND FOR A SIXTH CAUSE OF ACTION
(Against All Defendants, for Retaliation in Violation of the NYSHRL)

99.     Plaintiff repeats and realleges the foregoing paragraphs 1 through 98 as if fully set forth herein.

100.    Plaintiff has engaged in certain activities protected by the NYSHRL, including but not limited to those set forth in the foregoing paragraph 95.

101.    Defendants were aware that Plaintiff had engaged in the foregoing protected activity.

21

102.    Because of her protected activities, Defendants took adverse employment action against Plaintiff, including but not limited to that set forth in the foregoing paragraph 97.

103.    By virtue of the foregoing conduct, Plaintiff has suffered, and will continue to suffer, substantial economic losses, embarrassment, emotional distress, and other injury.

## AS AND FOR A SEVENTH CAUSE OF ACTION
(Against Millard and the Employer Defendants, for Defamation)

104.    Plaintiff repeats and realleges the foregoing paragraphs 1-103 as if fully set forth herein.

105.    Millard and the Employer Defendants made false statements to officers of the Harrison, New York Police Department, including those statements described in the foregoing paragraph 62, and made false statements to representatives of Paychex, including those set forth in the foregoing paragraph 63.

106.    The aforementioned false statements constituted defamation *per se*.

107.    When they made the aforementioned false statements or caused them to be made, Millard and the Employer Defendants knew those statements were false, or were willfully blind or recklessly indifferent to their falsity.  In particular, Millard and the Employer Defendants either knew, or were willfully blind or recklessly indifferent not to know, from records maintained in Best Cheese's Human Resources files on Plaintiff and other sources of information available to them, that "mileage" reimbursements Plaintiff had claimed and which they characterized as improper, were, in truth, agreed-upon components of her compensation package that had long been duly authorized by Engelkes and Margarites and were not superseded or replaced by the additional $300 "car allowance" she began to receive in 2016.  To the extent that Millard and the Employer Defendants did not have actual knowledge of the foregoing facts,

it was only because they willfully or recklessly neglected, before making their false statements about her, to consult those records or to resort to other available means of ascertaining those facts (including inquiring of Engelkes, Margarites or Plaintiff) which would have demonstrated the propriety of Plaintiff's expense reimbursements.

108.    When they made the aforementioned false statements or caused them to be made, Millard and the Employer Defendants acted with malice.

109.    When they made the aforementioned false statements or caused them to be made, Millard and the Employer Defendants acted unreasonably, abusively and in furtherance of improper purposes, including the fabrication of non-discriminatory reasons for Plaintiff's mistreatment and termination, and as retaliation for Plaintiff's protected activity.

110.    When they made the aforementioned false statements or caused them to be made, Millard and the Employer Defendants acted with personal spite and ill-will.

111.    When they made the aforementioned false statements or caused them to be made, Millard and the Employer Defendants acted with a high degree of awareness of the probable falsity of those statements or despite serious doubts as to their truth.

112.    Plaintiff believes defamatory statements about her, beyond those which she is presently able to allege with particularity, have been made by Defendants herein, and are within the exclusive knowledge of Defendants and the persons to whom they were made.  The details of those additional defamatory statements, and the persons to whom they were made, are ascertainable through discovery in this action.  Plaintiff reserves the right to amend this claim to include further allegations relating to such matters after discovery has been taken.

113. By virtue of the foregoing conduct, Plaintiff has suffered, and will continue to suffer, substantial economic losses, embarrassment, emotional distress, and other injury.

<u>AS AND FOR AN EIGHTH CAUSE OF ACTION</u>
<u>(Against All Defendants, for Intentional Infliction of Emotional Distress)</u>

114.    Plaintiff repeats and realleges the foregoing paragraphs 1-113 as if fully set forth herein.

115.    Defendants have engaged in extreme and outrageous conduct, which they intended to cause harm to Plaintiff.

116.    Defendants foregoing conduct caused severe emotional distress to Plaintiff.

<u>AS AND FOR A NINTH CAUSE OF ACTION</u>
<u>(Against All Defendants, for Negligent Infliction of Emotional Distress)</u>

117.    Plaintiffs repeat and realleged the foregoing paragraphs 1-116 as if fully set forth herein.

118.    Defendants had a duty to use ordinary care not to cause severe emotional harm to Plaintiff with respect to the matters set forth above.

119.    By virtue of the conduct alleged above, Defendants breached  duty of ordinary care to Plaintiff.

120.    Defendants' breach of said duty caused severe emotional distress to Plaintiff.

WHEREFORE, Plaintiff respectfully requests the Court grant the following relief:

A.    Declaratory judgment that Defendants, by the actions and conduct set forth in this Complaint (i) violated Title VII and the NYSHRL by discriminating against Plaintiff on the basis of her sex; (ii) violated the ADEA and the NYSHRL by discriminating against Plaintiff on the basis of her age; (iii) retaliated against Plaintiff in violation of Title VII, the ADEA and the NYSHRL; (iv) that Defendants' foregoing acts of discrimination and retaliation

24

against Plaintiff were intentional and willful; (v) that Defendants have engaged in defamation *per se* against Plaintiff; (vi) that Defendants have intentionally inflicted emotional distress upon Plaintiff; and (vii) that Defendants have negligently inflicted emotional distress upon Plaintiff;

        B.      Back pay (adjusted to make Plaintiff whole for any increased tax liability incurred by her receipt of a lump sum payment in a single year), front pay, and lost benefits, in an amount to be determined at trial but in no event less than $1,500,000;

        C.      Compensatory damages, including but not limited to damages for Plaintiff's emotional distress, mental anguish, humiliation, pain and suffering and reputational damage, in an amount to be determined at trial;

        D.      Liquidated damages pursuant to the ADEA;

        E.      Punitive Damages;

        F.      An award of reasonable attorneys' fees and costs incurred in connection with this action and related proceedings;

        G.      Prejudgment interest on all amounts awarded; and

        H.      Such other and further relief as the Court deems to be just, equitable and proper.

        Plaintiff demands trial by jury.

Dated:  June 14, 2017

                                By:                                  
                                  Louis A. Craco, Jr.
                                  Lauren J. Pincus
                                  Allegaert Berger & Vogel LLP
                                  111 Broadway, 18th Floor
                                  New York, New York 10006
                                  Telephone:    (212) 571-0550
                                  Facsimile:     (212) 571-0555
                                  lcraco@abv.com
                                  lpincus@abv.com

25